Good morning. May it please the Court, my name is John Ballas. I represent Vincent Jackson, the defendant. I intend to reserve five of my 20 minutes for rebuttal. Vincent Jackson didn't get a fair trial in this case. He was charged with drug trafficking crimes. Instead, a big portion of the trial revolved around evidence that he stabbed two individuals. That was basically the only real purpose of the evidence was to show that he was a dangerous person and that would kill over a $500 drug debt. It was like the big elephant in the room that you really couldn't ignore. The evidence should have been ruled inadmissible under Federal Rules of Evidence 403 and 404B. Preliminarily, the government claims that it wasn't a 404B question. It was really a relevance 401, 402 question. I don't think it makes that much of a difference in terms of the overall argument because the factors, the arguments are the same, whether the evidence was relevant, whether it was probative or how probative, and whether the prejudice to the evidence substantially outweighed its probative value. Is it your argument, counsel, that the stabbings of the two customers who didn't pay the drugs had nothing to do with Mr. Jackson's commerce in methamphetamine? The argument is it had little or if any relevance. The gist of court says it was relevant in two ways. That's how he collects and that's how he builds fear in customers who don't pay, when he fronts the drug and they don't pay. First of all, the first stabbing, Mario Ramirez, there was no evidence that it had to do with failing to pay a drug debt. What was the evidence? That he ran his mouth or something? Yes. The government's proffer before trial said that Mario Ramirez told the pedia, Miguel and Maria Pedia, that Vincent Jackson was storing the drugs at the house. And that's why Vincent Jackson stabbed him. At trial, it came out much differently. At trial, Miguel Pedia testified that Vincent Jackson was there. He went into the house with Mario Ramirez. Miguel Pedia could not see what happened. When they came out, he saw that Mario Ramirez was stabbed. He did not know. He didn't see what happened. He did see the stabbing. And then he took Mario Ramirez away toward the hospital, later flagged down a cop, and the police officer took. What was the testimony regarding why he was stabbed? There were two things. Miguel Pedia did not testify at all about any reason why. But Ruben Robledo testified that Vincent Jackson told him it was because he was opening up his mouth. Right. And then Beverly Key testified that it was involving drugs. Dealing dope. Involving dope, I think she said. I think she said dealing dope. Okay. I thought it was involving, but maybe dealing dope. But the governance proper was completely different. The governance proper was because he was saying that he told the pedias that in the pedia's house, Vincent Jackson was storing drugs there. But isn't that consistent with opening up his mouth? He's talking too much. Well, it's much more vague in general and doesn't show any really specific relevance to any of the issues in this case. Vincent Jackson was charged with distribution of drugs, conspiracy to distribute, possess but distribute drugs, and a number of substantive drug counts. The district court ruled it was relevant for two reasons. One was how the drug conspiracy, the operation, operated. And two was to bolster the testimony of the witnesses. In terms of how the drug conspiracy operated, the government presented over 20 witnesses, accomplices, where Mr. Vincent Jackson reportedly stored drugs, how he transported drugs, how he sold drugs to customers. There was no specific evidence, no counts that had to do with Mario Ramirez or Gil Montejano, the two people that got stabbed. There was no – they did not testify at trial. It wasn't – the testimony of the stabbing wasn't connected to any particular event. It was just general evidence that he was a dangerous person that would stab people if you crossed him. Not so. Jackson told Key that he threw away the coat because it had blood on it, ER-53, and that he stabbed Ramirez due to problems involving dealing dope, ER-51. Right. He said – he said Montejano – right. With respect to Montejano, he said – I'm talking about Ramirez. With respect to Ramirez, after the fact, he hooked up with Beverly Key, and Beverly Key said he showed him the – And Key testified that Jackson told her that he stabbed Montejano in the backyard of Lovato's house because Montejano had failed to pay Jackson for drugs Jackson had funded him. But that was not an issue in any issue in the case. The – the issue of the case was whether or not he distributed drugs, whether or not he was connected with these other people. The collection efforts of a merchant show what business he's in, don't they? To the – to the extent that that's true. I mean, a bank executes on a house. It shows that they're in the business of lending money and collecting it. Sure. But it has very marginal relevance to this case. And I think it's important to note that in this case, when the government has 22 witnesses on that show supposedly worry stores drugs. So you think that the evidence is more prejudicial than probative? Very much so. And was that objection made at trial? Did the judge go through a weighing process? The objection was made at trial. The judge did rule that it was not. How did he abuse his discretion? He abused his discretion because the case law is fairly clear that this type of evidence is extremely prejudicial. I cited at least four cases in my briefs where similar evidence was found to be an abuse of discretion in similar circumstances. Two of them were involving threats to witnesses. One was involving a district court judge ruled that a homicide should not come out in a drug conspiracy prosecution. That was the Vargas case. And then the Hodges case, the Ninth Circuit case, is where the defendant allegedly extorted a witness afterwards, and the Court ruled that it was an abuse of discretion to permit that type of evidence in. This Court and other courts have repeatedly emphasized how prejudicial this type of evidence is. To the extent that it was relevant, it was very minimally relevant. The government had 22 other witnesses of how the drug conspiracy operated. It wasn't necessary for any particular point to prove at the trial. There wasn't no – there was no specific acts that had to do with either Montejano or Ramirez in general. So you're saying it was prejudicial and it was likely to have affected the jury verdict? Very much so. Simply because of the violent acts, even though they were connected with dealing dope. Exactly. And the reason here is the government's case was fairly weak. They only had these accomplice witnesses. They had no confessions. They had no fingerprints. They had no videotapes. They had no surveillance evidence. This is a type of defense. I thought you told me that this evidence was unnecessary because they had 22 witnesses. The case was so strong. Now the case is weak. This evidence doesn't bolster their testimony at all. They had 22 witnesses. This testimony is a type of case you like as a defense attorney, because usually the juries look for corroborating evidence to be able to corroborate what the witnesses say. All these witnesses had significant criminal histories. They all had strong reasons to lie. I had the good fortune a number of years ago that the clerk with Judge Pragerson, and he used to tell prosecutors in this type of case, if your case was so strong, why did you muck it up with this type of evidence? And I think the reason here is, and the answer is, the case wasn't strong and they were worried about whether or not they could get a conviction. So they bring in evidence of two stabbings that had – that wasn't really specifically relevant to any particular issue of the case. But after the jury hears that type of evidence, it's hard for them to look at all the evidence critically and be able to find a not guilty verdict and let Mr. Jackson walk when the evidence is not strong. Ginsburg. But, counsel, we do not allow manner and means of the conspiracy evidence, don't we? Yes. And so what type of evidence would be admissible, in your view, to prove the manner and means of operating the conspiracy? Just all the other evidence that they presented, where the drugs were stored, how it was transported, how Mr. Jackson went with another individual, drove to specific drug deals, where he, in particular instances, sold drugs to an individual person. All that is how the conspiracy was operated. That's what the government did here. It presented a number of witnesses. There was no problem. I'd like to move on briefly, if the Court doesn't have any more questions on this point, to the issue of whether there was a single conspiracy or a multiple conspiracy. In general, the test is whether there's an overall agreement between all the defendants to perform various functions to carry out the objectives of the conspiracy. And the test is whether each defendant knew or had reason to know that their benefits were dependent on the success of the entire operation. And this Court's case in Duran says that's typically proven in two ways. One is you can infer agreement between all the defendants if there's proof of a single objective. For instance, if there's a 10-kilo deal and each person has a specific role with that, you can infer an overall agreement. Well, you admit there are lots of groups and subgroups and subagreements and co-conspirators, but you're saying it was multiple conspiracies? There's at least one. That there was no hub to the wheel. I mean, they're a big, big drug business. But your brief seems to indicate they were all sort of separate. They were not connected. Is that your argument? Right. I think that's it.  of the wheel. There were different spokes. Some of the testimony came out in the Bay Area. Most of it was in Sacramento. There wasn't a lot of links in between the two. In some cases, it's alleged that Mr. Jackson sold, like, for example, to Lisa Rodriguez directly a half ounce of methamphetamine, a small amount. Other times, he was selling supposedly kilos to more wholesalers. Sometimes he had other, supposedly, other people distribute drugs. There was no, no set overall conspiracy. Most of the people didn't know each other. They don't have to know each other in a conspiracy. Isn't that true? They don't have to know each other. You can have lots of co-conspirators and one doesn't have to know the other. But you have to be able to infer that there are other people and that your benefits are dependent on the success of the entire operation. So if you're driving a car with drugs, you don't necessarily have to know who's picking it up or who delivered it. But you have to know that, in general, that there are other people and you're all connected, you all have a single agreement involving this distribution of drugs. And that wasn't the – wasn't what happened here. The other thing that's important is – And in the Bay Area, to Valdez, who went to Sacramento to pick up drugs and deliver them in the Bay Area. I mean, I can understand a merchant having more than one location and having agents, different ones, working in two locations. But he's still working in both locations, isn't he? Yeah, he may be. I mean, if you take the evidence, accept the evidence. But that would mean that there's two conspiracies if he's working in two locations. It doesn't necessarily mean that there's one overall conspiracy. Well, as far as Jackson's concerned, it's his operation in two places. It's a conspiracy with the people in the Bay Area and it's a conspiracy with the people in Sacramento. But what about Valdez traveling to Sacramento to pick up drugs for delivery to the Bay Area? It is true that two of the 22 witnesses had some connection to both Sacramento and the Bay Area. Valdez, in particular, he was involved in distributing – buying drugs from Mr. Jackson in the early 90s. He went to prison, went away, and when he came back, he moved to Concord. And then in Concord, Mr. Jackson hooked up with him again, the way the evidence showed, and started distributing to him again. I don't think that shows that the Sacramento group is connected, though, to the Bay Area. Not all of them, no. Right. And I'm not saying if the government wouldn't have charged and proved two separate conspiracies, Mr. Jackson to Mr. Valdez in the Bay Area and the Bay Area people, that might have been one conspiracy. The other one might have been a second conspiracy. I'd like to say – But here the question is not whether somebody who was detailed in the Bay Area is charged with a conspiracy, including Sacramento. It's whether Jackson, who was involved in both areas, is involved in one conspiracy. Well, it's whether there was one conspiracy or whether there was more than one. I'm not contesting that Mr. Jackson was – the evidence was sufficient to show he was involved in a Sacramento group and he was sufficient to show that he was involved in a Bay Area group. But the evidence was not sufficient to show one overall conspiracy in this case. I'd like to save my remaining time for rebuttal. All right, counsel. Thank you. We'll hear from the government. Good morning again, Your Honors. Phil Talbert for the United States. With respect to the stabbings evidence, the district court did a careful balancing analysis under Rule 403 assessing both the probative value and the prejudice. What's your best case authority for the proposition that this was appropriate manner and means evidence? I think that Patterson's case is right on point with respect to acts of violence being ways and means evidence of a drug trafficking conspiracy. The Bradley case, which said that you need evidence to show that these stabbings were in furtherance of the conspiracy. And I couldn't find the evidence that was there to let me know that these stabbings were in furtherance of the conspiracy. Well, I think as long as the evidence is probative of the conspiracy, and in fact, in this case the district court found it highly probative based on, one, it made it more likely that the actual fronting and storage happened in this case. Two, that there was an organization. This was proof of the conspiracy, which was charged over a long period of time. The conspiracy required the showing of an agreement. Here, as counsel, is challenging the very evidence of an organization as opposed to a drug dealer dealing with all very separate customers in separate ways. Here, the government needed to show an organization. And so the stabbings evidence, when the stabbings were directly related to problems with storage and problems with collection of debts, went directly to the ways and means that the conspiracy operated. In fact, the very violence that Jackson used, per the evidence, showed how important it was for him to maintain the discipline within his organization, which was this was not a business corporation with articles and employee codes of conduct. This was an organization without walls that Jackson needed to set the rules and enforce them. And the storage of drugs in particular places, the fronting of drugs consistently to subdistributors who presumably would not have funds to buy that much quantity on a regular basis, all allowed this high volume drug trafficking operation to work. And so the ways and means, it was ways and means evidence here. Mr. Hurd also found as a separate basis that the events themselves were so memorable that given the other types of evidence in the case where witnesses would testify to receiving large amounts of drugs on a regular basis from Jackson over time, that this made the overall testimony from the witnesses more believable. It went to the value of their testimony because it was with respect to discrete events. All right. Thank you. The defendant also attacks the sufficiency of each in his brief, saying that there really wasn't enough evidence. Here we have, with respect to each of the stabbings, there are three witnesses who testify regarding each. Two of the witnesses as to each stabbing testify as to statements that Jackson made about the stabbing. And while, for example, the Ramirez stabbing, it's true that Ruben Robledo said that Jackson told Robledo that he stabbed Ramirez because he was running his mouth and that was attacked as being vague. Beverly Key also testified about the same, relative to the same stabbing that Jackson told her that he had problems with Ramirez concerning drugs. So this is not a case where there is one witness, particularly the victim of the Violent Act, who is making an allegation as to a statement that was made or something that happened. Here, as to each stabbing, there were three witnesses put on. The defendant attacks the proffer that the government made, somehow, I think, trying to call into question the district court's balancing under Rule 403. But, in fact, the proffer, when you look at it, had two essential elements. One was that there would be evidence of what witnesses saw after the stabbing. There was no claim that a witness saw Jackson physically stab one of the victims. And that there would be evidence as to statements that Jackson made after the fact regarding the stabbing. That's exactly the type of evidence that came out at trial. The fact that Mr. Robledo's testimony was somewhat vague, the fact that the government chose not to recall Alfred Martinez, who had already finished his testimony by the time that this issue was decided by the district court, doesn't go to the fact that the district court made a careful balancing and after, at the end of, I think it was the second day of trial, after Key's testimony, at the end of the day, the district court said that it looked like the government had tied up and it was really for the jury to determine what the value was. Mr. Talbert, the sufficiency of the evidence was not urged by counsel for the defense. Would you kindly address the issue of whether the indictment was correct in charging one conspiracy rather than several or at least two conspiracies? With respect to the variance challenge, the key members of this conspiracy were constant over a period of time other than when the members were in prison. Along with Vincent Jackson, Fred Martinez, his cousin, Anthony Canejo Valdez, Ruben Robledo, Junot Vasquez, John Medina, and Michael Lovato, all were consistently dealing within Jackson's drug trafficking organization over the period of the conspiracy, other than the times that each of those individuals were in prison. But each time that a witness such as Junot Vasquez testified that whenever he got out of jail on one of his probation or parole violations, then Jackson would contact him and he would start him up again with fronting meth for distribution, small amounts and then larger and then larger. So we have Jackson and these other people at sort of the center. We have all these business unions going in all directions in several areas. Where is the overall agreement that makes this one conspiracy? There's one conspiracy. What connects all of those? There's one conspiracy, because this organization was unique. I look at the court's case in Barbero with the drug importation scheme, that although there were different places where drugs were imported and there were changes in the facts here and there over time, there was one central idea, which was bringing in large amounts of drugs and the method that those were brought in. Here, you had consistent methods of storing drugs at different locations, moving them around, fronting drugs to subdistributors, and that Jackson was able to do this and have these people working together in a consistent method allowed the volume to be that much higher. And in drug trafficking organizations, it's how much drugs that you can consistently supply to customers over a period of time. Here, Jackson had built this core group of people and then brought in additional co-conspirators beyond the core group, followed the same mode of operation over a long period of time with those people, and was very successful in dealing high volumes of methamphetamine year in and year out during that time period. So we have the identity of the participants being, you know, the same, the core group the same over a period of time. The method of operation was the same as far as storage and fronting. Jackson's control over the drugs, even after they left his hands and they went down the distribution chain, there was evidence that when Michael Lovato was in prison and customers of Lovato's owed him for drugs that Jackson had supplied, that Jackson went out for a drive with Michael Lovato's wife, Michelle, and Michelle testified that he asked her to point out houses of people who owed money to Michael Lovato. There was, after the Ayub shooting in the Bay Area, Jackson directed Arlene Scheidler, Arlene Bella, to flush the drugs that she had at her apartment down the toilet. And those drugs had been supplied by Jackson. So he showed, or through that testimony, the government showed that he had controls over the organization, not just in dealing with, you know, a distance with each And he employed certain of his sub-distributors, such as Canejo Valdez, to help him on deliveries. John Medina helped on deliveries. Robert Amaro helped on deliveries. So the, here there was a lot more of the hallmarks of an organization than there would be in a drug trafficking case where you had a single drug trafficker who was just simply selling to different clients. The, and with respect to the Durand case that counsel cited, each of the people who was in that organization, to the extent they were benefiting from this, for example, the sub-distributor who either kept a certain amount of money or a certain amount of methamphetamine as his or her profit, that profit, that benefit, would be dependent on the success of the overall organization, Jackson, to be able to bring in a large amount of supply on a consistent basis and then to distribute that large amount of supply over a consistent basis. And Jackson was able to do that better than many other drug traffickers through enforcing discipline, being very careful about his handling of drugs, and being very careful about keeping track of people who owed him money and how much and when he was going to collect. Let me touch just briefly on the sentencing issue. In preparing for oral argument, I recognize the recent Ninth Circuit case of United States v. Dupas, which I think deals with counsel's argument in his brief regarding the Bowie claim related to due process. I think that it looks like the claim is the same. This Court has already decided that Booker applies in total as opposed to one-half of it applying and one-half of it not applying under Bowie. Counsel, do you agree that there should be a limited remand under Ameline in this case? No. I think in this case we have one of the exceptions where here, although there was an objection below with respect to sentencing on drug amount, it is so clear from the record that the district court, the statements at sentencing, the adoption of the huge amount of drugs recommended by the pre-sentence report and the district courts noting that that was probably conservative, that those statements and that would re-address the government's motion for an upward departure under the guidelines for the amount of drugs. Shouldn't we give the district court the opportunity to do that with the guidelines being advisory? I think under the harmless error standard, there's no reasonable doubt the district court would sentence differently here. There is in my mind. It wasn't just a jury trial, so doesn't the jury have to decide the amount? Under Ameline. Well, under Booker, it is discretionary with respect to, yeah. Booker, Ameline says in this case, if the jury hasn't found those facts, they have to, it has to be a limited remand. This wouldn't be a plain error review. No, I think this is harmless error review. Why? If it's raised below, it's not plain error review. It's de novo, isn't it? I think it's harmless error review that there's an alleged constitutional violation of the Sixth Amendment rights for sentencing under Booker. So instead of plain error, it's harmless error, which is a lesser standard than plain error, right? Yes. But I think that the district court's statements are so strong with respect to his consideration of this case that I don't think that there's true doubt that the sentence would be in there. I don't think it's, how can it be harmless error if the jury didn't find it, didn't make the finding that's required? We're kind of in a new, gray area, but I was thinking if the jury didn't find the amount, it can't be harmless error because you've deprived someone of a Sixth Amendment, of the right to have the jury find the amount. I don't know. I'm not sure there was a, I don't think he has a right to have the jury find that amount. He had the jury found the amounts required by Apprendi. But the extra amounts. The extra amounts that the judge sentenced on. Now the judge, if there were a limited remand, the judge could. Well, I'm not talking about limited remand. Limited remand is for plain error, and you reminded me that he preserved this error. So wouldn't it just be straight Booker error and a remand for resentencing? That's what the defendant would request here. The government's position is that given what the district court said, that. I'll have to look at that. But in Ameline, only the dissent said that there had to be a showing that there would be a different sentence. The majority said if there's a possibility, then it goes back for resentencing. Right? Well, and I think that given what the district court said, this is one of those exceptional cases where. But Ameline didn't allow for exceptional cases. The majority opinion. It said that wherever there's Booker error under mandatory guidelines, the trial judge gets a second look at it to see if he would have imposed the same under advisory guidelines. Is that right? Well, I think it's the harmless error analysis under the, for a six-minute violation that would be the standard. So you say that even if the district court judge had said there's so much methamphetamine here that whether these guidelines were advisory or mandatory, I still would have given the same term. If he says that, then there can be no remand? I think that's the case. Even when it was a jury term? Yes. The jury has to find the facts. Well, the jury did find the facts required. That's true. So to that extent, doesn't there have to be a sentencing hearing as to the extra amount? I don't believe so, because the remand would be for resentencing under Booker with the same standards which were complied with as far as the presentence report being prepared. Well, the court didn't consider facts. The problem is that under the guidelines there are certain factors the court can't consider, and now the court can consider those now that the guidelines are advisory. That's the problem, is the court sentence kind of with, you know, with some strings, with some, you know, the court didn't have the full panoply of discretion that it now has, because there were certain things under the guidelines that could not be considered in sentencing. Now the court has full discretion to consider age, race, those other factors that the court used to not be able to consider. That is true. That is true. That's why I'm thinking it might not be a bad idea to remand this. We'll look at it. All right. Thank you. Thank you. Starting with the stabbing evidence again, the point I want to make is that when you're comparing the probative value to the prejudice, the question is not entirely whether the evidence is relevant, but also how probative and how needed it is for this case. In this case, the government had a lot of evidence they put on how the conspiracy operated, where the drugs were stored, how it was transported, et cetera. Let me ask you this, and I don't have the exact facts right before me, but where was Montejano located? Sacramento. All right. And where was Ramirez located? Sacramento. So the fact that they're both in Sacramento doesn't show the spread of the conspiracy by itself. Right. And so in this case, you could have the evidence didn't do anything to bolster the witness's testimony. It didn't do anything to add to show the conspiracy. If at all, even if you determine it's relevant, it had very minimal relevance to this case. But the prejudice was overwhelming. And the cases generally show that this is the type of evidence that could likely infringe on someone's fair trial. And I think that's what you have in here. The case was not overwhelming. There was no corroborating evidence of any of the accomplices' testimony. And without that evidence, there was more than a reasonable possibility. It was pretty likely that you would have not gotten the same result. With respect to the variance argument or the multiple conspiracy argument, I think it was interesting. The prosecutor said that this case was unique. And what I think what he was essentially saying was it doesn't really fit the standards of the Ninth Circuit and the other cases when you have to show one overall conspiracy. So by saying it's unique, he tries to make another exception for it. But the facts are that there were different time frames. In Bay Area, it was between 1998 to 2002, while the Sacramento area covered the whole 10-year period. There were different people involved in the Bay Area as in Sacramento. There were only two people that had any kind of a link between both the Sacramento and the Bay Area group. And the methods of operation were different. The drugs, the evidence that he, the prosecutor presented right now, was stored in Sacramento. There was no drugs that Mr. Jackson supposedly stored in the Bay Area. Instead, there were times where he supposedly made trips to the Bay Area himself or with others involving people that distribute drugs. So I think it's fairly clear that there's two, at least two conspiracies, and that was prejudicial to Mr. Jackson. With respect to the Sixth Amendment and going to the sentencing issue, the government has conceded in its brief that it was a Sixth Amendment violation. They've conceded that it was properly preserved below. So it's not a limited remand issue. The Court should give a full remand, vacate the sentence, and let the judge take the whole look at it again. I cited in my reply brief where Booker itself says that in cases where there's not a Sixth Amendment violation, then you could look on whether harmless error or plain error applies. But here, where there is a Sixth Amendment violation, they've conceded. They've conceded it was preserved below. The only proper thing to do is to vacate and remand. Thank you, counsel. Thank you to both counsel. Thank you. The case just argued is submitted for decision by the Court, and we will be in recess for 15 minutes.
judges: D.W. Nelson, Rawlinson, Bea